STATE OF NORTH CAROLINA v. MALCOLM GEDDIE, JR.

No. 561A94

(Filed 6 December 1996)

**1. Criminal Law § 401 (NCI4th Rev.)— capital murder—jury selection—statement of court regarding law—no error**

There was no error in jury selection in a capital first-degree murder prosecution where the trial court instructed the venire members prior to jury selection that the court would instruct the jury on the law and that counsel should not question the venire members about the law except to ask whether they would accept and follow the law. Defendant contends that there is a risk that the instruction led the jurors to mistrust defense counsel, who asked about the jurors' views on capital punishment, but questioning jurors about the law clearly differs from asking jurors their views and opinions about capital punishment. Defendant complains of the theoretical potential for prejudice created by a correct statement of the respective roles of the judge, jury and counsel but does not even suggest abuse of discretion by the trial court. Moreover, both prosecutors and defense counsel were allowed ample opportunity to question jurors' beliefs about the death penalty.

**Am Jur 2d, Jury § 279; Trial § 302.**

**2. Jury § 141 (NCI4th)— capital murder—jury selection— questions about parole—denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to question venire members about their understanding of the parole eligibility of persons sentenced to life imprisonment.

**Am Jur 2d, Jury § 205.**

**Procedure to be followed where jury requests information as to possibility of pardon or parole from sentence imposed. 35 ALR2d 769.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

**Prejudicial effect of statement of prosecutor as to possibility of pardon or parole. 16 ALR3d 1137.**

STATE v. GEDDIE

[345 N.C. 73 (1996)]

**3. Jury § 92 (NCI4th)— capital murder—jury selection—only one attorney allowed to question juror**

There was no abuse of discretion in a capital first-degree murder prosecution where the trial court informed the parties that only one attorney for each side would be permitted to address the court on any given issue; a defense attorney was conducting *voir dire* of a prospective juror when the attorneys discovered that the other defense attorney had represented DSS in a proceeding in which the juror's granddaughter was removed from the custody of the juror's daughter; the trial court denied the defense request that the second attorney examine the juror; and the juror indicated that she did not harbor any animosity toward the second defense attorney. The N.C. Supreme Court has repeatedly found no abuse of discretion when a defendant has failed to show that further questioning of prospective jurors would likely have produced different answers or testimony and the stated purpose of the request here was to save time, not to elicit different testimony. Moreover, a full and searching *voir dire* was not hampered by the court's denial of the request, nor did the court prohibit defense counsel from communicating with and prompting each other during the *voir dire*. The decision to peremptorily challenge Dupree was a fully informed tactical decision.

**Am Jur 2d, Jury §§ 193, 194.**

**Right of counsel in criminal case personally to conduct the voir dire examination of prospective jurors. 73 ALR2d 1187.**

**Effect of accused's federal constitutional rights on scope of voir dire examination of prospective jurors— Supreme Court cases. 114 L. Ed. 2d 763.**

**4. Jury § 215 (NCI4th)— capital murder—jury selection— juror's belief in capital punishment—challenge for cause denied**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by refusing to dismiss a potential juror for cause where the juror candidly admitted her strong belief in the death penalty, but also stated that she would not impose the death penalty automatically but would consider what she learned during trial. The juror did not demonstrate an inability or unwillingness to consider everything

that was presented and to follow the court's instructions regarding the law.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

5. **Jury § 34 (NCI4th)— capital murder—special venire summoned—excusals on statutory grounds—defendant's presence**

There was no error in a capital first-degree murder prosecution where the trial court instructed the clerk to summon additional jurors after trial commenced; summonses were issued to forty additional persons; a third summons subsequently was issued to sixty additional persons; and prospective jurors from the first two jury selection listings appeared before various district court judges pursuant to N.C.G.S. § 9-6 to seek excusals or deferrals on statutory grounds. Nothing in the record supports defendant's contention that the special venire members knew they were being summoned specifically for this case and, assuming that the venire was a special venire but that the regular form summons was used, there is no authority for the proposition that the commencement of defendant's trial dates back to the date a summons for a special venire was issued. Error has been found in excusing members of a special venire outside of a defendant's presence only when the excusals occurred after the case had been called for trial and the record here indicates that all excusals and deferrals occurred pretrial or in defendant's presence after the trial began.

**Am Jur 2d, Jury §§ 159, 188.**

6. **Criminal Law § 388 (NCI4th Rev.)— capital murder— judge's question—clarification of street slang**

The trial court did not err in a capital prosecution for first-degree murder by denying defendant's motion for a mistrial where a State's witness testified that defendant bought a "ten-cent" piece of crack after the shooting and the trial court asked whether a ten-cent piece of crack cost ten cents. The question called for clarification of potentially confusing street vernacular and was within the scope of the discretion afforded under N.C.G.S. § 8C-1, Rule 614(b).

**Am Jur 2d, Trial §§ 274, 275.**

### 7. Homicide § 287 (NCI4th)— capital murder—instruction on second-degree murder denied—evidence of provocation—insufficient to negate premeditation

The trial court did not err in a capital first-degree murder prosecution by denying defendant's request for an instruction on second-degree murder where defendant argued that any evidence of premeditation and deliberation was negated by evidence of provocation in that the State's own evidence showed that the victim and defendant were engaged in an extended argument, but the testimony indicated that the argument involved no more than raised voices and that defendant fired a warning shot, ordered the victim to remove his shoes and socks, and ignored the victim's pleas for his life. There is ample evidence to support a finding that defendant premeditated and deliberated the murder and that his ability to reason was not overcome by his argument with the victim.

**Am Jur 2d, Homicide § 439.**

### 8. Homicide § 393 (NCI4th)— capital murder—instruction on second-degree murder denied—evidence of intoxication insufficient

The trial court did not err in a capital first-degree murder prosecution by denying defendant's request for an instruction on second-degree murder where defendant argued that testimony that he had drunk two pints of "white lightning" raised a reasonable inference of voluntary intoxication sufficient to negate the specific intent to kill. The evidence showed only that defendant drank some liquor and there was no evidence indicating that defendant was so intoxicated as to be utterly incapable of forming the intent to kill.

**Am Jur 2d, Homicide § 439.**

**Modern status of the rules as to voluntary intoxication as defense to criminal charge. 8 ALR3d 1236.**

### 9. Evidence and Witnesses § 694 (NCI4th)— capital sentencing hearing—evidence excluded—no offer of proof

The trial court did not err in a capital sentencing hearing by excluding evidence about the death of one of defendant's siblings or by sustaining the prosecutor's objection to a question asked of defendant's psychologist. Defendant made no offer of proof and did not rephrase the question to the psychologist when

STATE v. GEDDIE

[345 N.C. 73 (1996)]

offered the opportunity, and the content and relevance of the excluded testimony are not evident from the context of the questioning.

**Am Jur 2d, Trial §§ 440-443.**

**10. Criminal Law § 1340 (NCI4th Rev.)— capital sentencing hearing—evidence excluded—offer of proof necessary**

There was no error in a capital first-degree murder prosecution in the exclusion of evidence where defendant made no offer of proof but argued on appeal that *Lockett v. Ohio*, 438 U.S. 586 confers on a defendant in a capital case an affirmative right to place relevant mitigating evidence before the sentencer and that an offer of proof was unnecessary. Absent an offer of proof, defendant cannot show that the excluded evidence was relevant to any mitigating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 440-443.**

**Comment Note.—Ruling on offer of proof as error. 89 ALR2d 279.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**11. Criminal Law § 1340 (NCI4th Rev.)— capital sentencing hearing—statements of accidental shooting excluded—no error**

The trial court did not err in a capital sentencing hearing by excluding statements made by defendant at the time of his arrest in which defendant claimed that the gun went off accidentally. Defendant does not specify the relevance to any mitigating circumstance and, given that the jury had rejected any notion of accidental shooting by its guilty verdict, the statements would appear to implicate defendant in an attempt to deceive police officers and avoid responsibility for the crime and thus would not be mitigating.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**STATE v. GEDDIE**

[345 N.C. 73 (1996)]

## 12. Criminal Law § 440 (NCI4th Rev.)— capital sentencing— prosecutor's argument—no gross impropriety

There was no gross impropriety in a capital sentencing hearing in the prosecutor's argument which defendant contended sought to confuse the jury into believing that defendant had previously been convicted of armed robbery, rather than attempted robbery, in the District of Columbia. The prosecutor's statements were correct representations of the evidence before the jury and did not imply that defendant had been convicted of any crime other than attempted robbery in the District of Columbia.

**Am Jur 2d, Trial §§ 611, 626.**

## 13. Criminal Law § 447 (NCI4th Rev.)— capital sentencing— prosecutor's argument—portrayal of evidence—no gross impropriety

There was no gross impropriety in a capital sentencing hearing in the prosecutor's argument which defendant contended misrepresented the testimony of defendant's expert psychologist. Viewing the prosecutor's argument in the context of all the arguments and the court's curative instruction, it is clear that the impact of the prosecutor's inaccurate portrayal of the psychologist's testimony was slight and did not amount to a gross impropriety.

**Am Jur 2d, Trial §§ 611, 695.**

**Propriety and prejudicial effect of counsel's negative characterization or description of witness during summation of criminal trial—modern cases. 88 ALR4th 209.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

## 14. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—incomplete statement of law—no error

The trial court did not err in a capital sentencing hearing by not intervening *ex mero motu* where the prosecutor argued that the jurors, in order to impose a sentence of death, had to find that one or more aggravating factors were present, that any mitigating circumstances found did not outweigh the aggravating circum-

STATE v. GEDDIE

[345 N.C. 73 (1996)]

stances, and that the aggravating circumstance or circumstances were sufficient to justify the death penalty. Although defendant complains that the prosecutor failed to mention that the findings must be unanimous, it is the role of the court to instruct the jury on application of the law. The prosecutor's statement was a correct, if incomplete, representation of the law.

**Am Jur 2d, Trial §§ 572, 643.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

15. **Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—impoverished and abusive upbringing—no gross impropriety**

There was no gross impropriety requiring intervention *ex mero motu* in a prosecutor's argument in a capital sentencing hearing where defendant contended that the prosecutor misstated the function of mitigating evidence when he argued that many people grow up impoverished and in abusive conditions but that not all of them rob and kill others. Rather than misstating the function of mitigating evidence, the prosecutor argued that the jury should not give great weight to defendant's background and upbringing. Such an argument is within the bounds of propriety for a prosecutor.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 572.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

16. **Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument —mitigating circumstances as excuses**

There was no gross impropriety requiring intervention *ex mero motu* in a capital sentencing hearing where defendant contended that the prosecutor misstated the law when he argued that a synonym for defendant's mitigating circumstance was "excuses." Although mitigating circumstances are not legal excuses for committing crimes and the argument was incorrect,

defense counsel clarified this aspect of the law during final arguments and the trial court instructed the jury correctly as to how mitigating circumstances are to be found and weighed.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 572.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**17. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—value of impaired capacity mitigating circumstance**

There was no gross impropriety requiring intervention *ex mero motu* in a capital sentencing hearing where defendant contended that the prosecutor argued that the statutory mitigating circumstance of impaired capacity has no mitigating value. Such a statement would be incorrect, but it is clear from the context that the prosecutor was urging the jury to give little weight to the mitigating circumstance. Such arguments are proper advocacy and are not tantamount to arguing that the statutory mitigating circumstances have no value as a matter of law.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 572.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**18. Criminal Law § 461 (NCI4th Rev.)— capital sentencing— prosecutor's argument—death as deterrent**

The trial court did not err by not intervening *ex mero motu* in a capital sentencing hearing where the prosecutor argued that sentencing defendant to death was the only way to insure that he would not kill again.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**19. Criminal Law § 475 (NCI4th Rev.)— capital sentencing— prosecutor's argument—biblical reference**

There was no error requiring intervention *ex mero motu* in a capital sentencing hearing where the prosecutor stated that defendant killed the victim for less than "thirty pieces of silver." Disapproved biblical references have been to the effect that the law enforcement powers of the State come from God and that to resist those powers is to resist God. While some of the jurors in this case may have recognized that these words were biblical, the reference was slight and did not warrant *ex mero motu* intervention.

**Am Jur 2d, Criminal Law §§ 557, 648.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**20. Criminal Law § 453 (NCI4th Rev.)— capital sentencing— prosecutor's argument—rights of defendant versus rights of victim**

An argument by the prosecutor in a capital sentencing proceeding contending that defendant was the beneficiary of all the constitutional protections of our criminal justice system and asking what right defendant gave the victim was not grossly improper.

**Am Jur 2d, Criminal Law §§ 664-667.**

**21. Criminal Law § 1382 (NCI4th Rev.)— capital sentencing— mitigating circumstances—lack of prior criminal activity— prior violent felonies**

The trial court did not err in a capital sentencing proceeding by submitting to the jury the mitigating circumstance that defendant had no significant history of prior criminal activity where his record included three violent assaults. The first two convictions occurred ten and fifteen years before the trial and the third was five years old and was for the inchoate crime of attempted robbery. A rational juror could have found that defendant did not have a significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1441.**

STATE v. GEDDIE

[345 N.C. 73 (1996)]

Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d, 947.

22. **Criminal Law § 1384 (NCI4th Rev.)— capital sentencing— mitigating circumstances—impaired capacity rather than emotional disturbance**

The trial court did not err in a capital sentencing proceeding by not submitting the mitigating circumstance that defendant was under the influence of a mental or emotional disturbance at the time of the offense. Defendant's psychologist diagnosed defendant as a substance abuser and antisocial person, characteristics which relate to diminished capacity, and never testified to any mental disorder or emotional disturbance at the time of the killing. The court properly submitted the impaired capacity circumstance. N.C.G.S. § 15A-2000(f)(2).

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1441.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d, 947.**

23. **Criminal Law § 1385 (NCI4th Rev.)— capital sentencing—mitigating circumstances—impaired capacity—intoxication**

The trial court did not err in a capital sentencing proceeding by not submitting the mitigating circumstance of mental or emotional disturbance based on voluntary intoxication. To the extent that voluntary intoxication affects a defendant's ability to control or understand his actions, voluntary intoxication is properly considered under the impaired capacity circumstance. Defendant's evidence of impaired capacity was properly submitted to the jury.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1441.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d, 947.**

24. **Criminal Law § 1392 (NCI4th Rev.)— capital sentencing—instructions—nonstatutory mitigating circumstances**

The trial court did not err in a capital sentencing proceeding by instructing the jury not to consider nonstatutory mitigating circumstances unless it found that those circumstances had mitigat-

ing value. Jurors are not required to agree with a defendant that the evidence proffered in mitigation is in fact mitigating unless the legislature has declared it to be mitigating as a matter of law by including it among the statutory mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1441.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d, 947.**

25. **Criminal Law § 1349 (NCI4th Rev.)— capital sentencing—instructions—weighing aggravating against mitigating circumstances**

The trial court did not err in a capital sentencing proceeding in its instructions on Issues Three and Four, which involve weighing the aggravating circumstances against the mitigating circumstances. The precise instructions given have been approved in other cases, were correct, and properly informed the jurors of their duty to weigh the mitigating circumstances against the aggravating circumstances.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1441.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d, 947.**

26. **Criminal Law § 1402 (NCI4th Rev.)— capital sentencing— death sentence not disproportionate**

The record in a capital murder prosecution fully supported the sentencing jury's finding of aggravating circumstances and did not suggest that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The distinguishing characteristics of the case compel the conclusion that this case is not similar to any in which the death penalty was found to be disproportionate and is similar to many in which it was found to be proportionate.

**Am Jur 2d, Criminal Law § 628.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Britt (Joe Freeman), J., at the 12 September 1994 Criminal Session of Superior Court, Johnston County, upon a jury verdict finding defendant guilty of first-degree

murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for robbery with a dangerous weapon was allowed 23 January 1996. Heard in the Supreme Court 10 September 1996.

*Michael F. Easley, Attorney General, by Tiare B. Smiley, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Marshall Dayan, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for the first-degree murder and robbery with a firearm of Reginald Dale Emory. The jury found defendant guilty on both charges and recommended a sentence of death for the first-degree murder. The trial court sentenced defendant to death for the murder and to a consecutive forty-year term of imprisonment for the robbery. Defendant appeals from his convictions and sentences. We hold that defendant received a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show that on the evening of 25 November 1992 defendant, Reginald Dale Emory, Paul Stanley Sanders, Frankie Boderick, and Thomas "Junior" Boderick met in the home of Eloise Speed, which was known as an illegal liquor house. Defendant was drinking "white lightning." Defendant, Emory, and Thomas Boderick asked Frankie Boderick and Sanders if they would drive them to Smithfield. Frankie Boderick responded by handing the keys to his car to Sanders and asking him to drive the other men to Finney Drive. Frankie Boderick and Sanders had an understanding that Sanders would drive the three men to Finney Drive so they could get some Thanksgiving money and five dollars for gas for Boderick's car.

Defendant, Sanders, Emory, and Thomas Boderick (Boderick) then left Speed's house, and Sanders drove them to the Forbes Manor apartment complex on Finney Drive in Smithfield. After parking, all four men stopped briefly at one apartment and then walked to the apartment of Deborah Bethea. While there, defendant and Emory began to argue over money. Bethea asked the men to leave after they became very loud. All four men left the apartment.

Thomas Boderick testified that after the men left the apartment and began walking toward the car, defendant asked Emory to

pay for the gas for the drive to Smithfield. Defendant said to Emory, "You owe me some money. When are you going to pay me?" Emory responded, "I don't owe you nothing." Sanders testified that when defendant reached the car, he told Emory that he could not get into the car until he paid defendant five dollars. Defendant ordered Emory to take off his shoes and put all his money on the ground. Defendant then fired one shot into the ground. At that point, Sanders ran from the scene. Boderick observed as defendant ordered Emory to "[e]mpty your pockets" and Emory complied. After Emory removed his shoes and socks, defendant pointed the gun at Emory's chest, and Emory begged three times, "Please don't shoot me." Boderick testified that five to ten seconds after Emory's last plea for his life, defendant shot Emory and then bent down to pick up some change that Emory had dropped on the ground. Immediately after the gunshot, Boderick called to Sanders, saying, "Come on, Stanley, let's go." Sanders ran back to the car and drove off with Thomas Boderick and defendant.

At approximately 12:53 a.m. on 26 November 1992, Officer Thomas H. Graham of the Smithfield Police Department, responding to a call, found Emory lying in the parking lot and three to four individuals standing on the sidewalk. Officer Graham went to Emory, who was lying on his back, and discovered blood coming from his head. Emory was unconscious, had a wound to the back of his head, and was gasping for air. Officer Graham also observed that Emory was wearing a T-shirt and pants, which were down to his ankles, and that the victim's shoes and socks were off his feet, lying approximately one to two feet from his body. A wallet was at the victim's feet. Officers subsequently searched the wallet and found a North Carolina identification card and a pay stub, but no money.

Approximately five minutes after Officer Graham arrived on the scene, emergency medical personnel arrived, wrapped Emory's head, and transported him to the hospital. Emory subsequently died from a gunshot wound to the head.

Meanwhile, after leaving the scene of the shooting, defendant, Sanders, and Boderick proceeded to Maggie Pearl's, a nightclub and pool room. At Maggie Pearl's, defendant purchased ten dollars worth of crack cocaine from a man in the parking lot. The men then returned to Eloise Speed's house. Sanders testified that on the drive back to Speed's house, defendant said, "I shot this here MF— [sic] in the head." Boderick testified that he asked defendant whether he had

killed Emory, and defendant replied, "Yeah, I killed him." When they got to Speed's house, defendant asked his nephew to dispose of defendant's gun. Several hours later, Sanders and Boderick made statements to the police. Both stated that defendant shot Reginald Emory.

During the sentencing phase, the State presented evidence of three prior violent assaults defendant had committed. Charles Edward Atkinson testified that on the evening of 28 October 1979, he and defendant became involved in a "tussle," and defendant shot him three times in the leg. As a result, Atkinson's leg had to be amputated. James McIver, a deputy with the Johnston County Sheriff's Department, testified that he investigated an assault with a deadly weapon inflicting serious injury upon James Lemon on 17 June 1984. Lemon had a small round wound on his left shoulder. Deputy McIver concluded that defendant inflicted the wound using a small firearm. The State also offered evidence of defendant's conviction of attempted robbery in the District of Columbia on 11 July 1989.

Defendant offered evidence that he came from a broken home and had been abused as a child. His mother was a bootlegger and ran an illegal liquor house. Defendant's family was very poor and lived in a one-bedroom house with no bathroom or running water. Two of defendant's fourteen brothers and sisters died as children. When defendant was a teenager, his mother and her live-in boyfriend went to prison for abusing defendant and three other children; defendant and his siblings were placed into foster care at that time. After defendant's mother was released from prison, defendant and several of his brothers and sisters lived with her again. Defendant left his mother's home at age fifteen after an incident in which his mother beat him with a broomstick and injured his eye.

Defendant also introduced expert testimony regarding his mental state and his addiction to drugs and alcohol. Robert Brewington, an expert in clinical psychology and substance-abuse diagnosis and counseling, testified that defendant was a victim of child abuse and has limited intellectual and coping skills and a highly addictive personality. Brewington testified that defendant understands the difference between right and wrong; however, he opined that because defendant was taught to use violence to settle conflicts, he does not have the basic coping skills to deal with situations in which he is under pressure. Brewington characterized defendant as a substance abuser and an antisocial person.

During the sentencing proceeding, the jury found as aggravating circumstances that defendant had been previously convicted of a violent felony and that the first-degree murder was committed while defendant was engaged in a robbery with a firearm. Three statutory mitigating circumstances were submitted but not found by the jury: that defendant had no significant history of prior criminal activity, that defendant's capacity to appreciate his criminality or to conform his conduct to the law was impaired, and the catchall circumstance. The jury found six of nineteen nonstatutory mitigators. Based upon its findings, the jury recommended a sentence of death for the first-degree murder.

**[1]** Defendant first assigns as error the following instruction, which the trial court gave to venire members prior to jury selection:

Now, after all of the evidence has been presented, and after you have listened to the arguments of counsel, I will instruct you as to all the law that you are to apply to evidence in this case. It is your duty to apply the law as I will give it to you and not as you think the law is, nor as you might like the law to be. . . . Obviously at this point, you're not expected to know the law. *Counsel should not question you about the law, except to ask whether you will accept and follow the law as given to you by this court.*

(Emphasis added.) Although defendant did not object to the instruction, he now argues that the trial court committed plain error in giving it. Defendant contends that the emphasized portion informed the venire members that *voir dire* questions about their views on capital punishment were inappropriate. Thus, he argues, there is a risk that the instruction led the jurors to mistrust the defense counsel, who did in fact ask about the jurors' views on capital punishment, and that this mistrust infected the jurors' views of the defense throughout the trial and during the capital sentencing proceeding and decision.

The extent of the inquiry of a prospective juror rests within the trial court's discretion, and we will not find reversible error unless an abuse of discretion is shown. *State v. Huffstetler*, 312 N.C. 92, 103, 322 S.E.2d 110, 118 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). In this instance, defendant does not even suggest abuse of discretion by the trial court. Instead, he complains of the theoretical potential for prejudice created by a correct statement of the respective roles of the judge, jury, and counsel with regard to applying the law in a criminal case. The trial court simply advised the jurors that they were not expected to know the law and that neither the prose-

cution nor the defense should probe their knowledge of the law. Questioning jurors about the law clearly differs from asking jurors their views and opinions about capital punishment. Moreover, the record reveals that both the prosecutors and defense counsel were allowed ample opportunity during *voir dire* to question jurors' beliefs about the death penalty. Defendant has not shown error, much less plain and prejudicial error, in the instruction. This assignment of error is overruled.

[2] Defendant next assigns as error the denial of his motion to question venire members about their understanding of the parole eligibility of persons sentenced to life imprisonment. This Court has consistently held that jurors should not be questioned during *voir dire* concerning their perceptions about parole eligibility. *State v. Lynch*, 340 N.C. 435, 451, 459 S.E.2d 679, 685 (1995), *cert. denied*, ——— U.S. ———, 134 L. Ed. 2d 558 (1996). Defendant's request therefore was properly denied. This assignment of error is overruled.

In his next assignment of error, defendant challenges two of the trial court's rulings during jury selection. First, defendant contends that the trial court committed plain error when it refused to allow a change in counsel during the *voir dire* of prospective juror Edna Dupree. Second, defendant contends the trial court erred in denying his challenge for cause to venire member Thelma Moore.

[3] Prior to the commencement of jury selection, the trial court informed the parties that only one attorney for each side would be permitted to address the court on any given issue. The court added that the attorney addressing the court would be permitted to confer with his or her co-counsel as needed. During jury selection, defense attorney Ethridge was conducting *voir dire* of prospective juror Edna Dupree when the attorneys discovered that defense attorney Holland had represented the Department of Social Services in a proceeding in which Dupree's granddaughter was removed from the custody of Dupree's daughter. Defense counsel asked the court to permit Holland to continue the *voir dire* because "[i]t would be quicker if you would allow me [Holland] to ask some questions concerning her relationship with me that we think might be relevant." The court denied the request. Ethridge then proceeded to ask Dupree about the proceeding and her feelings toward Holland. Dupree indicated that she did not harbor any animosity toward Holland. Defendant argues that the trial court's denial of his request "likely" cost the defense a peremptory challenge.

"Although wide latitude is given counsel in voir dire examination of jurors, the form and extent of the inquiry rests within the sound discretion of the court." *State v. Johnson*, 317 N.C. 343, 382, 346 S.E.2d 596, 618 (1986). This Court repeatedly has found no abuse of discretion when a defendant has failed to show that further questioning of prospective jurors would likely have produced different answers or testimony. *See State v. Daughtry*, 340 N.C. 488, 509, 459 S.E.2d 747, 757 (1995), *cert. denied*, — U.S. —, 133 L. Ed. 2d 739 (1996); *State v. Davis*, 340 N.C. 1, 19, 455 S.E.2d 627, 636, *cert. denied*, — U.S. —, 133 L. Ed. 2d 83 (1995). Defendant has made no such showing here. The stated purpose of the request to have Holland question Dupree was to save time, not to elicit different testimony. Moreover, a full and searching *voir dire* was not hampered by the court's denial of the request, nor did the court prohibit defense counsel from communicating with and prompting each other during the *voir dire*. Thus, the decision to peremptorily challenge Dupree was a fully informed tactical decision, not the result of a restricted *voir dire*. We find no abuse of discretion in this ruling.

**[4]** Second, defendant argues that the trial court erred when it refused to excuse potential juror Thelma Moore for cause. During *voir dire*, the prosecutor asked Moore whether she could follow the law as it was given to her and whether she would be able to consider both life imprisonment and death as appropriate punishments for first-degree murder. Moore responded affirmatively to both questions. Later, while defense counsel was questioning Moore regarding her beliefs about capital punishment, the following exchange occurred:

MR. HOLLAND: In the event the jury found a defendant guilty of first-degree murder, would you in every case impose the death penalty?

JUROR MOORE: Well, that would be kind of hard to say, but I do believe in it.

MR. HOLLAND: If the jury has returned in the guilt phase a verdict of guilty of first-degree murder, that is, malice of forethought [sic], deliberate, intentional, would you in every case in which the jury returns such a verdict impose the death penalty as the appropriate punishment?

JUROR MOORE: Probably.

STATE v. GEDDIE

[345 N.C. 73 (1996)]

MR. HOLLAND: Your Honor, in view of [the] answer to that, we would challenge for cause.

THE COURT: Oh, no. You haven't gone through it fully with her. Challenge for cause is denied at this point. You may pursue it further, however.

MR. HOLLAND: Mrs. Moore, could you consider imposing life imprisonment in a first-degree murder case as well as imposing the death penalty?

JUROR MOORE: [No response.]

THE COURT: Ma'am, you're not saying that you would automatically impose the death penalty in every first-degree murder case, are you?'

JUROR MOORE: Not in every one.

THE COURT: Yes, ma'am. All right. Go ahead.

MR. HOLLAND: [Appears to consult with defendant and co-counsel.] Mrs. Moore, do you feel you would be able to follow the instructions of the Court as to the standard for making a decision on the penalty phase and consider all of the matters that the judge instructs you to so consider and follow the law as he presents it to you?

JUROR MOORE: I would try, but I have a strong feeling for the death penalty. I believe in capital punishment.

MR. HOLLAND: How strong is that feeling for the death penalty?

JUROR MOORE: Pretty strong, because I feel like something has got to be done.

MR. HOLLAND: What do you mean by, "Something has got to be done"?

JUROR MOORE: Well, to help the public control crime.

MR. HOLLAND: Have you formed an opinion as to the guilt or the innocence of the defendant at this time?

JUROR MOORE: No.

MR. HOLLAND: If this jury entered a verdict of guilty of first-degree murder, could you consider imposing life imprisonment in a first-degree murder case as well as imposing the death penalty?

Juror Moore: Well, that might be based on what I heard.

Mr. Holland: Would you always impose the death penalty in cases in which the jury found someone guilty of first-degree murder?

Juror Moore: I've been asked that question. Probably.

Mr. Holland: We would renew our challenge for cause.

The Court: No, she said probably and just prior to that she said it would be based on what she heard. You may pursue it, however.

Mr. Holland: In that event, Your Honor, we would use a peremptory challenge and excuse this witness.

This Court has held that "[t]he granting of a challenge for cause where the juror's fitness or unfitness is arguable is a matter within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994). Moore indicated to the district attorney that she could consider either a life sentence or the death penalty and that she would try to follow the law and the court's instructions, even if she disagreed with the law. While she candidly admitted her strong belief in the death penalty, she also stated that she would not impose the death penalty automatically but would consider what she learned during trial. The constitutional standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *Davis*, 340 N.C. at 21, 455 S.E.2d at 637. Despite her strong feelings in favor of the death penalty, Moore did not demonstrate an inability or unwillingness to consider everything that was presented and to follow the court's instructions regarding the law. The trial court did not abuse its discretion in refusing to excuse Moore for cause on these facts. This assignment of error is overruled.

[5] In his next assignment of error, defendant contends that the trial court erred by proceeding with jury selection from a venire in which contacts between prospective jurors and the district court had occurred outside the presence of the defendant and after the case had been called for trial. Trial commenced on Monday, 12 September

1994. An initial venire list had been used to summon seventy prospective jurors. In a letter dated 24 August 1994, Judge Wiley F. Bowen instructed the Clerk of Superior Court to summon forty additional jurors for Wednesday, 14 September 1994, for this case. Summonses accordingly were issued to forty additional persons. A third summons subsequently was issued to sixty additional persons. Pursuant to N.C.G.S. § 9-6, prospective jurors from the first two jury selection listings appeared before various district court judges and sought excusals or deferrals on statutory grounds before the convening of the 12 September Criminal Session.

Defendant argues that the second summons for forty persons at Judge Bowen's request was for a special venire. Defendant contends that a summons for a special venire serves the functional equivalent of calling the case and thus triggers a defendant's right to be present at any hearings for excusals or deferments. His argument relies on the assumption that a summons for a special venire identifies the particular case for which the jurors are being called. Defendant contends that members of the special venire who were excused pretrial knew they were being summoned specifically for his case and that therefore there is a theoretical possibility that some discussed specifics of the case with the judges who excused or deferred them. The State disputes this contention and argues that special venire members receive the same form summons as do members of a regular venire. Nothing in the record supports defendant's contention that the special venire members knew they were being summoned specifically for this case. Therefore, the usual form summons, which does appear in the record and which does not identify a specific case, imports verity.

Assuming that the venire was a special venire within the meaning of N.C.G.S. § 9-11 but that the regular form summons was used, there is no authority for the proposition that the commencement of a defendant's trial relates back to the date a summons for a special venire issues. To the contrary, in *State v. Cole*, 331 N.C. 272, 275, 415 S.E.2d 716, 717 (1992), this Court explicitly held that it was not error to excuse prospective jurors before a trial commences. No logical reason suggests application of a different rule to a special venire where venire members were not informed of the particular case for which they were being summoned. This Court has found error in excusing members of a special venire outside of a defendant's presence only when the excusals occurred *after* the case had been called for trial. See *State v. McCarver*, 329 N.C. 259, 260-61, 404 S.E.2d 821, 822 (1991). The excusals defendant complains of here occurred

before trial. We therefore conclude that defendant's argument is without merit.

Defendant obliquely argues further that excusals and deferrals of venire members occurred out of his presence after trial commenced. The record indicates, however, that all excusals and deferrals occurred pretrial or in the defendant's presence after trial commenced. The burden is on the defendant to show error; he has not shown that excusals or deferrals of prospective jurors occurred outside his presence after trial commenced. This assignment of error is therefore overruled.

**[6]** Defendant next assigns as error the trial court's denial of defendant's motion for a mistrial. State's witness Thomas Boderick testified that after the shooting of Reginald Emory, defendant bought a "ten-cent" piece of crack from a man at a pool room. At that point, the trial court interjected:

THE COURT: Well, for clarification, does a ten-cent piece of crack cost ten cents?

THE WITNESS: It cost [sic] ten dollars.

Defendant moved for a mistrial, arguing that this testimony provided information that had not yet been elicited by the State. Defendant contended that the State could not have elicited this testimony without first laying a foundation showing the witness's knowledge of the price and value of crack cocaine. Defendant argued further that the testimony was important evidence because it could have led the jurors to believe that defendant had acquired ten dollars from his armed robbery of Emory.

"The court may interrogate witnesses, whether called by itself or by a party." N.C.G.S. § 8C-1, Rule 614(b) (1992). Defendant concedes that judges may interrogate witnesses but contends that the judge exceeded the scope of Rule 614(b) with this interrogation. We disagree. This Court has held that "[i]n fulfilling the duties of a trial judge to supervise and control the course of a trial so as to insure justice to all parties, the judge may question a witness in order to clarify confusing or contradictory testimony." *State v. Ramey*, 318 N.C. 457, 464, 349 S.E.2d 566, 571 (1986). The question complained of called for clarification of potentially confusing "street" vernacular. The question was within the scope of the discretion afforded the court under Rule 614(b). This assignment of error is overruled.

**[7]** In his next assignment of error, defendant contends that the trial court erred in denying defendant's request for an instruction on second-degree murder. First-degree murder is, *inter alia*, the unlawful killing of a human being committed with malice, premeditation, and deliberation. N.C.G.S. § 14-17 (Supp. 1996); *State v. Gainey*, 343 N.C. 79, 82, 468 S.E.2d 227, 229 (1996). The unlawful killing of a human being with malice but without premeditation and deliberation is murder in the second degree. N.C.G.S. § 14-17; *Gainey*, 343 N.C. at 83, 468 S.E.2d at 230. If the evidence satisfies the State's burden of proving each element of first-degree murder, including premeditation and deliberation, and there is no evidence to negate these elements other than defendant's denial, the trial court should exclude second-degree murder from the jury's consideration. *State v. Conner*, 335 N.C. 618, 634-35, 440 S.E.2d 826, 835 (1994).

Defendant argues first that any evidence that he premeditated and deliberated the murder was negated by evidence of provocation because the State's own evidence showed that defendant and the victim were engaged in an extended argument. A killing is "premeditated" if "the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing." *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). A killing is "deliberate" if the defendant acted "in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* The fact that defendant was angry or emotional will not negate the element of deliberation during a killing unless there was anger or emotion strong enough to disturb defendant's ability to reason. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 338 (1986). "[E]vidence that the defendant and the victim argued, without more, is insufficient to show that the defendant's anger was strong enough to disturb his ability to reason." *State v. Solomon*, 340 N.C. 212, 222, 456 S.E.2d 778, 785, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 438 (1995). There is ample evidence to support a finding that defendant premeditated and deliberated the murder and that his ability to reason was not overcome by his argument with the victim. The testimony indicated that the argument involved no more than raised voices. Moreover, several of the facts in evidence indicated that defendant premeditated and deliberated the killing. Among other things, there was evidence that defendant fired a warning shot, ordered the victim to remove his shoes and socks, and ignored the victim's pleas for his life. The trial court did

not err in refusing to instruct on second-degree murder under this evidence.

[8] Next, defendant argues that the testimony indicating that he had drunk two pints of "white lightning" raises a reasonable inference of voluntary intoxication sufficient to negate the specific intent to kill, thus meriting an instruction on second-degree murder (defendant did not request an instruction on voluntary intoxication). It is well settled that a defendant is entitled to an instruction on voluntary intoxication only after defendant has produced substantial evidence which would support a conclusion by the trial court that "the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated intent to kill." *State v. Laws*, 325 N.C. 81, 98, 381 S.E.2d 609, 619 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). Evidence tending to show only that defendant drank some unknown quantity of alcohol over an indefinite period of time before the murder does not satisfy the defendant's burden of production. *Id.* Here, the evidence showed only that defendant drank some liquor. There was no evidence indicating that defendant was so intoxicated as to be utterly incapable of forming the intent to kill. Therefore, defendant would not have been entitled to an instruction on voluntary intoxication, nor did the evidence as to his drinking merit an instruction on second-degree murder. We thus overrule this assignment of error.

[9] In his next assignment of error, defendant argues that the trial court should not have excluded three items of evidence he offered during the sentencing proceeding. First, defendant contends that the court improperly excluded evidence about the death of one of defendant's siblings. Defendant's first witness at the penalty phase was his sister, Mary Geddie Richardson. Richardson testified that she and defendant had an older sister, Grace, who died when defendant was almost seven years old. Defense counsel asked Richardson if she recalled the circumstances of Grace's death. The State objected, and the court sustained the objection. The court subsequently submitted as a nonstatutory mitigating circumstance the death of a loved one when defendant was seven years old.

To prevail on a contention that evidence was improperly excluded, either a defendant must make an offer of proof as to what the evidence would have shown or the relevance and content of the answer must be obvious from the context of the questioning. *State v.*

*Barton,* 335 N.C. 741, 749, 441 S.E.2d 306, 310 (1994). Defendant con-
cedes that he did not make an offer of proof, and the content and rel-
evance of the excluded testimony are not evident from the context of
the questioning. We therefore reject this argument.

Defendant argues next that the trial court erred when it sustained
the prosecutor's objection to a question asked of defendant's expert
psychologist. The prosecutor objected to the following question:
"Based on your experience and your interviews, did you form any
opinions concerning his capacity to deal with the situation?" The trial
court sustained the objection and offered defense counsel an oppor-
tunity to rephrase. Defense counsel did not rephrase, choosing
instead to move to a different line of questioning, nor did defense
counsel make an offer of proof as to how the expert psychologist
would have answered if allowed. Again, the failure to make an offer
of proof is fatal to defendant's argument. The context of the ques-
tioning provides clarity neither as to the information defendant was
attempting to elicit nor as to its relevance. Moreover, the trial court
did not foreclose defendant's eliciting this aspect of the expert's opin-
ion; rather, the defense attorney was merely asked to pose the ques-
tion in more clear and relevant terms.

[10] Defendant argues further that an offer of proof is unnecessary to
establish an independent Eighth Amendment violation in these situa-
tions because *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973 (1978),
confers on a defendant in a capital case an affirmative right to place
relevant mitigating evidence before the sentencer. Defendant con-
tends that the exclusion of Richardson's and the psychologist's testi-
mony denied him this right. We disagree. Absent an offer of proof,
defendant cannot show that the excluded evidence was relevant to
any mitigating circumstance; thus, he has not shown that the court
failed to comport with the mandate of *Lockett.*

[11] Defendant's final contention in this assignment of error is that
two statements he made to Sergeant Walter A. Martin at the time of
his arrest should have been admitted. In the first, defendant claimed
that he handed the gun to Thomas Boderick and that the gun went off
accidentally. In the second, defendant again claimed that the gun
went off accidentally, but he stated that the gun was in his hands
when it went off. Sergeant Martin was allowed to testify that defend-
ant made statements but was not allowed to testify to the substance
of those statements.

Any evidence which the trial court deems to have probative value relating to mitigating circumstances may be presented at a capital sentencing proceeding . N.C.G.S. § 15A-2000(a)(3) (1988) (amended 1994); *State v. Pinch*, 306 N.C. 1, 19, 292 S.E.2d 203, 219, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, — U.S. —, 130 L. Ed. 2d 650 (1995), and *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). Defendant does not specify the relevance to any mitigating circumstance of his statements to Sergeant Martin, however. Further, given that the jury, by its conviction in the guilt phase, had rejected any notion of an accidental shooting, the statements would appear to implicate defendant in an attempt to deceive the police officers and avoid responsibility for the crime and thus not to be mitigating. Under these circumstances, the trial court properly excluded testimony regarding the content of the statements as irrelevant to any mitigating circumstance.

We conclude that the trial court did not err in excluding these items of evidence. This assignment of error is therefore overruled.

[12] In his next assignment of error, defendant contends that the prosecution's penalty phase arguments contained misstatements of the law and the evidence, were intended to inflame the jury, and were grossly improper. Although defendant did not object at trial, he now contends that the remarks violated his state and federal rights to a fair trial such that the trial court erred by failing to intervene *ex mero motu*. When defense counsel fails to object to a prosecutor's argument, "the remarks 'must be gross indeed for this Court to hold that the trial court abused its discretion in not recognizing and correcting *ex mero motu* the comments regarded by defendant as offensive only on appeal.' " *State v. Basden*, 339 N.C. 288, 300, 451 S.E.2d 238, 244 (1994) (quoting *State v. Brown*, 327 N.C. 1, 19, 394 S.E.2d 434, 445 (1990)), *cert. denied*, — U.S. —, 132 L. Ed. 2d 845 (1995). In making this inquiry, "it must be stressed that prosecutors are given wide latitude in their argument." *State v. Rouse*, 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied*, — U.S. —, 133 L. Ed. 2d 60 (1995). Moreover, the prosecutor in a capital case has a duty to advocate zealously that the facts in evidence warrant imposition of the ultimate penalty. *Id.* Having examined the arguments complained of in the light of these principles, we conclude that they were not so grossly improper as to violate defendant's rights and that the trial court therefore did not err in failing to intervene *ex mero motu*.

Defendant argues first that the prosecutor sought to confuse the jury into believing that defendant was convicted of armed robbery, rather than attempted robbery, in the District of Columbia. In the context of urging the jury to find as an aggravating circumstance that defendant had previously been convicted of a felony involving violence or the threat of violence, the prosecutor referred to the District of Columbia's armed robbery statute. The prosecutor pointed out that the statute and a court opinion, both of which were placed in evidence, stated clearly that robbery is a crime involving violence and that attempted robbery is a felony in the District of Columbia. These statements were correct representations of the evidence that was before the jury and did not imply that defendant had been convicted of any crime other than attempted robbery in the District of Columbia.

**[13]** Defendant argues next that the prosecutor misrepresented the testimony of defendant's expert psychologist. Defendant contends that the prosecutor argued that the psychologist testified that defendant had good coping and adaptive skills, when in fact the psychologist's testimony was to the opposite effect.

The psychologist testified that defendant "has limited intellectual resources and coping skills." He also testified, however, that in interacting with defendant, "[defendant] comes across as being much more intelligent and socially adept than what the scoring would indicate." In light of this testimony, the prosecutor's description of defendant's coping skills as "good" may have been an overstatement, but his reference to defendant's adaptive skills was a fair inference to be drawn from the testimony.

Prosecutors are given wide latitude in arguments to the jury and are permitted to argue the evidence which has been presented as well as all reasonable inferences which can be drawn therefrom. *State v. Shank*, 327 N.C. 405, 407, 394 S.E.2d 811, 813 (1990). The trial court instructed the jurors that if their recollection of the evidence differed from that of the court, the district attorney, or the defense attorney, they were to rely solely upon their recollection of the evidence in their deliberations. Viewing the prosecutor's argument in the context of all the arguments and the court's curative instruction, it is clear that the impact of the prosecutor's inaccurate portrayal of the psychologist's testimony was slight and did not amount to a gross impropriety requiring the trial court's *ex mero motu* intervention.

**[14]** Defendant next contends that the prosecutor misstated the law in five instances. In the first instance, the prosecutor argued that in order to impose a sentence of death, the jurors had to find that one or more aggravating circumstances were present, that any mitigating circumstances found did not outweigh the aggravating circumstances, and that the aggravating circumstance or circumstances were sufficient to justify the death penalty. Defendant complains that the prosecutor failed to mention that each of these findings must be unanimous. This statement was a correct, if incomplete, representation of the law; moreover, it is the role of the court, not the prosecutor, to instruct the jury on application of the law. The prosecutor did not misstate the law in this instance, and the trial court thus did not err in failing to intervene *ex mero motu.*

**[15]** In the second instance, defendant contends that the prosecutor misstated the function of mitigating evidence when he argued that many people grow up impoverished and in abusive conditions but that not all of them rob and kill others. We disagree with defendant's characterization of the statements. The prosecutor did not misstate the function of mitigating evidence; rather, he argued that the jury should not give great weight to the mitigating circumstances of defendant's unfortunate background and upbringing. Such an argument is within the bounds of propriety for a prosecutor, who has a duty to pursue ardently the imposition of the death penalty. *Pinch,* 306 N.C. at 24, 292 S.E.2d at 221-22.

**[16]** In the third instance, defendant contends that the prosecutor misstated the law when he argued that a synonym for defendant's mitigating circumstances was "excuses." Defendant is correct in asserting that mitigating circumstances are not legal excuses for committing crimes. Any misunderstanding the jurors may have had about the law as a result of the prosecutor's statement was subsequently cured, however. Defense counsel clarified this aspect of the law during final arguments, and the trial court instructed the jury correctly as to how mitigating circumstances are to be found and weighed. Therefore, although the prosecutor's statement was legally incorrect, we conclude that the trial court did not commit error warranting a new sentencing proceeding by failing to intervene *ex mero motu.*

**[17]** In the fourth instance, defendant contends that the prosecutor argued that even if the jury were to find the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance, the circumstance has no mitigating value.

Such a statement would be incorrect. *See State v. Fullwood*, 329 N.C. 233, 238, 404 S.E.2d 842, 845 (1991). We find no evidence that the prosecutor made such an argument, however. On the transcript page defendant cites, the following argument appears:

> And when you get to looking for mitigating value, or start to weigh the mitigating with aggravating circumstances, consider can the defendant blame what he did to Reginald Emory on his family? Can the way he dehumanized Reginald, by forcing him to take his shoes and sock[s] off, be lessened by his alcohol abuse? And the way he tortured Reginald in the last minute of his life, by having him beg for his life be at all minimized by his drug use of cocaine, heroin and PCP? Can the almost execution-like slaying of Reginald be at all mitigated by the defense of so-called diminished capacity?

It is clear from the context that the prosecutor was urging the jury, if it were to find that the circumstance existed, to give little weight to the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Such arguments are proper advocacy for the State and are not tantamount to arguing that statutory mitigating circumstances have no mitigating value as a matter of law. The trial court thus did not err in failing to intervene *ex mero motu*.

**[18]** In the final instance, defendant contends that the prosecutor misstated the law when he argued that sentencing defendant to death was the only way to insure that he would not kill again. This Court has held such specific deterrence arguments proper. *E.g.*, *Rouse*, 339 N.C. at 92, 451 S.E.2d at 561. The trial court thus did not err by allowing this argument.

**[19]** Defendant next contends that two of the prosecutor's arguments were grossly improper and designed to inflame the passions of the jury. First, the prosecutor stated that defendant killed the victim for less than "thirty pieces of silver." Defendant contends that this was an improper biblical reference. Biblical references this Court has disapproved have been arguments to the effect that the law enforcement powers of the State come from God and that to resist those powers is to resist God. *Laws*, 325 N.C. at 120, 381 S.E.2d at 632-33. When the potential impact of a biblical reference is slight, it does not amount to gross impropriety requiring the court's intervention. *Id.* at 121, 381

S.E.2d at 633. While some jurors may have recognized that the words were biblical, the reference was slight, not warranting the trial court's *ex mero motu* intervention.

[20] Finally, defendant contends that the prosecutor inflamed the passions of the jury by pointing out that defendant was the beneficiary of all the constitutional protections afforded defendants in our criminal justice system and by asking, "[W]hat one right did he give Reginald Dale Emory in this life?" This Court has held that such arguments are not grossly improper. *Basden*, 339 N.C. at 306, 451 S.E.2d at 248.

We conclude that the trial court did not err by failing to intervene *ex mero motu* during the prosecution's final arguments. This assignment of error is overruled.

[21] Defendant next assigns as error the trial court's submission to the jury of the statutory mitigating circumstance that defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1). Defendant argues that no reasonable juror could have found this circumstance because defendant's record included three prior violent felonies. Defendant did not object when the trial court asked defendant and the State if either objected to submission of this circumstance. Nevertheless, defendant now contends that the credibility of the defense was injured because jurors probably believed defendant had requested submission of this circumstance and was thereby asking them to attach mitigating value to his criminal record.

The test governing the submission of this statutory mitigating circumstance is " 'whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity.' " *State v. Walker*, 343 N.C. 216, 223, 469 S.E.2d 919, 922 (quoting *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988)), *cert. denied,* — U.S. —, 136 L. Ed. 2d 180 (1996). "If so, the trial court has no discretion; the statutory mitigating circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant." *Id.; see also State v. Ingle*, 336 N.C. 617, 642, 445 S.E.2d 880, 893 (1994) ("[W]here evidence is presented in a capital sentencing proceeding that may support a statutory mitigating circumstance, N.C.G.S. § 15A-2000(b) directs that the circumstance must be submitted for the jury's consideration absent defendant's request or even over his objection."), *cert. denied,* — U.S. —, 131

**STATE v. GEDDIE**

[345 N.C. 73 (1996)]

L. Ed. 2d 222 (1995). When the trial court is deciding whether a rational juror could reasonably find this mitigating circumstance to exist, the nature and age of the prior criminal activities are important, and the mere number of criminal activities is not dispositive. *State v. Walls*, 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995), *cert. denied*, — U.S. —, 134 L. Ed. 2d 794 (1996).

Defendant's first two felony convictions occurred ten and fifteen years before this trial. The third conviction was five years old and was for the inchoate crime of attempted robbery, which jurors could have considered less significant than a completed violent felony. Given these facts, a rational juror could have found that defendant did not have a significant history of prior criminal activity. We conclude that there was sufficient evidence to support the submission of the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance, and we overrule this assignment of error.

[22] In his next assignment of error, defendant contends that the trial court erred in failing to submit to the jury the statutory mitigating circumstance that defendant was under the influence of a mental or emotional disturbance at the time of the offense. N.C.G.S. § 15A-2000(f)(2). In support of this argument, defendant asserts that there was evidence of a dispute, that he had been drinking, and that he displayed hostility toward the victim after the killing. Defendant also points to the testimony of his expert psychologist indicating that he lacked coping skills, was a substance abuser, and had been the victim of child abuse. Defendant argues that this evidence was sufficient to warrant submission of the (f)(2) mitigating circumstance. Upon the basis of the same evidence, however, the trial court properly submitted the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance—that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. The evidence defendant presented related to the impairment circumstance. Defendant did not present evidence that at the time of the killing, he was under the influence of a mental or emotional disorder or disturbance. Defendant's mental and emotional state *at the time of the crime* is the central question presented by the (f)(2) circumstance. *State v. McKoy*, 323 N.C. 1, 28-29, 372 S.E.2d 12, 27 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). The use of the word "disturbance" in the (f)(2) circumstance "shows the General Assembly intended something more . . . than mental impairment which is found in another mitigating circumstance." *State v. Spruill*, 320 N.C. 688, 696, 360 S.E.2d 667,

STATE v. GEDDIE

[345 N.C. 73 (1996)]

671 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988). Defendant's psychologist never testified to any mental disorder or emotional disturbance at the time of the killing; rather, he diagnosed defendant as a substance abuser and antisocial person, characteristics which relate to diminished capacity.

[23] Defendant also mistakenly relies on voluntary intoxication to support submission of the (f)(2) circumstance. This Court has held that "voluntary intoxication by alcohol or narcotic drugs at the time of the commission of a murder is not within the meaning of a mental or emotional disturbance under [N.C.]G.S. [§ ] 15A-2000(f)(2)." *State v. Irwin*, 304 N.C. 93, 106, 282 S.E.2d 439, 447-48 (1981). To the extent that it affects a defendant's ability to control or understand his actions, voluntary intoxication is properly considered under the (f)(6) circumstance for impaired capacity. *Id.* at 106, 282 S.E.2d at 448.

Defendant's evidence of impaired capacity was properly submitted to the jury, and he has not shown evidence sufficient to support a finding that he was under the influence of a mental or emotional disturbance within the meaning of the (f)(2) circumstance at the time he committed the murder. This assignment of error is overruled.

[24] Defendant next argues that the trial court erred by instructing the sentencing jury not to consider nonstatutory mitigating circumstances unless it found that those circumstances had mitigating value. Defendant contends that allowing the jury discretion to decide whether to give mitigating value to a submitted nonstatutory mitigating circumstance does not satisfy the constitutional requirement that the sentencer consider and give effect to mitigating evidence. *See McKoy*, 494 U.S. at 442-43, 108 L. Ed. 2d at 381. This Court has rejected this argument, holding that jurors are not required to agree with a defendant that the evidence proffered in mitigation is in fact mitigating unless the legislature has declared it to be mitigating as a matter of law by including it among the statutory mitigating circumstances. *State v. Williams*, 339 N.C. 1, 44-45, 452 S.E.2d 245, 270-71 (1994), *cert. denied*, —– U.S. —–, 133 L. Ed. 2d 61 (1995). This assignment of error is overruled.

[25] In his final assignment of error, defendant contends that the trial court erred in instructing the jury on Issue Three as follows:

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against

the mitigating circumstances. When deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in Issue Two.

Defendant also complains of the instruction on Issue Four, which was worded similarly. He argues that jurors hearing these instructions could conclude that they were allowed, rather than required, to consider mitigating circumstances they previously had found when weighing the aggravating circumstances against the mitigating circumstances.

The precise instruction quoted above was approved by this Court in two recent cases. *State v. Daniels*, 337 N.C. 243, 280-81, 446 S.E.2d 298, 321 (1994), *cert. denied*, — U.S. —, 130 L. Ed. 2d 895 (1995); *State v. Lee*, 335 N.C. 244, 286-87, 439 S.E.2d 547, 569-70, *cert. denied*, — U.S. —, 130 L. Ed. 2d 162 (1994). In those cases, we concluded that the instruction did not preclude the jurors from giving effect to all mitigating evidence they found to exist. We likewise conclude here that the instructions were correct and that they properly informed the jurors of their duty to weigh the mitigating circumstances against the aggravating circumstances in their consideration of Issues Three and Four. This assignment of error is overruled.

**[26]** Defendant does not argue that the record does not support the jury's finding of the aggravating circumstances; that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; or that the sentence of death was disproportionate. It is nevertheless this Court's statutory duty to make these determinations. N.C.G.S. § 15A-2000(d)(2).

The record fully supports the jury's finding of the aggravating circumstances. It does not suggest that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn, then, to our final duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury," *Lee*, 335 N.C. at 294, 439 S.E.2d at 573, and to guard "against the capricious or random imposition of the death penalty," *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). To determine whether the sentence of death is disproportionate, we compare this case to

other cases that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

This case has certain distinguishing characteristics relevant to the Court's proportionality review. First, there is the unprovoked and deliberated nature of the killing. Defendant forced his victim to beg for his life and showed no remorse for shooting him. The jury convicted defendant of first-degree murder under the theory of premeditation and deliberation as well as under the felony murder rule. A conviction of premeditated and deliberate murder "indicates a more calculated and cold-blooded crime." *Davis*, 340 N.C. at 31, 455 S.E.2d at 643. Second, the jury found two aggravating circumstances: that defendant previously had been convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and that defendant committed the murder while engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5). The aggravating circumstance of a previous felony conviction involving the use or threat of violence to the person is one that is commonly present when a jury recommends the death penalty. *See, e.g., State v. Keel*, 337 N.C. 469, 503-04, 447 S.E.2d 748, 767 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 147 (1995).

This Court has often reviewed the circumstances of the cases in which the sentence of death was held to be disproportionate. *See, e.g., State v. Powell*, 340 N.C. 674, 697-98, 459 S.E.2d 219, 231-32 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 688 (1996). We need not reiterate such review here. It suffices to say that the foregoing distinguishing characteristics compel the conclusion that this case is not similar to any in which the death penalty was found to be disproportionate and is similar to many in which it was found to be proportionate.

We conclude that the death sentence was not excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.